1  LORETTA KING
   Acting Assistant Attorney General
2  Civil Rights Division
   DONNA M. MURPHY
3  Acting Chief, Housing and Civil Enforcement Section
   TIMOTHY J. MORAN
4  Deputy Chief
   Housing and Civil Enforcement Section
5  NANCY F. LANGWORTHY
   Trial Attorney
6  Housing and Civil Enforcement Section
   Civil Rights Division
7  United States Department of Justice
   950 Pennsylvania Ave, N.W. - G Street
8  Washington, D.C.  20530
   202-616-8925/202-514-1116 - fax
9  JAMES A. McDEVITT
   United States Attorney
10 PAMELA J. DeRUSHA
   Assistant United States Attorney
11 P.O. Box 1494
   Spokane, Washington 99210
12 509-353-2767/509-353-2766 - fax

13 Attorneys for Plaintiff United States

14                UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF WASHINGTON
15                    SPOKANE DIVISION

16  UNITED STATES OF AMERICA,          )
                                       )
17              Plaintiff,             )
         v.                            )  C.A. No. CV-07-301-LRS
18                                     )
    LANZCE G. DOUGLASS; LANZCE         )  **CONSENT DECREE**
19  G. DOUGLASS, INC.; PRAIRIE HILLS,  )
    LLC; HILBY STATION, LLC; BEVERLY   )
20  NERAAS, as Personal Representative and Executor )
    of the Estate of Donald E. Neraas; INDEPENDENT )
21  HOME DESIGNS, INC.; RALPH W. HOOVER; )
    J. R. BONNETT ENGINEERING, INC.; and )
22  GARY S. NELSON,                    )
                    Defendants.        )
23  _____)

24                   **I. INTRODUCTION**

25      1.  This Consent Decree is entered between the United States of America and Defendants

    Lanzce G. Douglass, Lanzce G. Douglass, Inc. ("Douglass, Inc."), Prairie Hills, LLC, Hilby
26
    Station, LLC, Beverly Neraas, as personal representative and executor of the Estate of Donald E.
27
    Neraas, Independent Home Designs, Inc., Ralph W. Hoover, J. R. Bonnett Engineering, Inc., and
28
    Gary S. Nelson.

2.  The United States has filed this lawsuit on September 25, 2007 to enforce the provisions of Title VIII of the Civil Rights Act of 1968 ("the Fair Housing Act"), as amended, 42 U.S.C. §§ 3601 *et seq*., and Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181-12189 ("the ADA").  Specifically, the United States alleges that the Defendants have engaged in a pattern or practice of discrimination against persons with disabilities and denied rights to a group of persons because of disability by failing to design and construct four apartment complexes in Spokane County -- the Rock Creek Apartments, Prairie Hills Apartments, Granite Court Apartments, and Hilby Station Apartments (the subject properties) -- with the features of accessible and adaptable design and construction required by 42 U.S.C. § 3604(f)(3)(C).  There is a total of 684 apartments at these complexes, 228 of which are ground floor dwellings covered by the Fair Housing Act.[1]  Each of these complexes was designed and constructed for first occupancy after March 13, 1991, and is therefore subject to the accessible design and construction requirements of 42 U.S.C. § 3604(f)(3)(C).

3.  The United States also  alleges that Defendants Lanzce G. Douglass, Douglass, Inc., Prairie Hills, LLC, and Hilby Station, LLC violated Title III of the ADA by failing to design and construct the rental offices at Rock Creek, Prairie Hills, Granite Court and Hilby Station to be readily accessible to and usable by individuals with disabilities as required by 42 U.S.C. § 12183(a)(1) and the implementing regulations issued by the Department of Justice, 28 C.F.R. Part 36, including the Standards for Accessible Design, 28 C.F.R. Part 36, Appendix A (the Standards).  The rental offices at these four complexes were each designed and constructed for

---

[1]  Rock Creek Apartments, located at 926 and 930 E. Sitka Avenue, 6911 N. Nevada Street and 911 E. Beacon Avenue in Spokane, Washington, consists of six residential buildings containing a total of 132 apartments, 44 of which are on the ground floor.  Prairie Hills Apartments, located at 1718 E. Lincoln Road, Spokane, Washington, consists of nineteen residential buildings containing 384 apartments, 128 of which are on the ground floor.  Granite Court Apartments is located at 15408 E. 4th Avenue, Spokane Valley, Washington and consists of two residential buildings containing 48 dwelling units, 16 of which are on the ground floor. Hilby Station Apartments, located at 5317 S. Palouse Highway #4, Spokane, Washington, consists of five residential buildings containing 120 apartments, 40 of which are on the ground floor.  Because none of the buildings in these complexes has an elevator, only the ground floor apartments must meet the Act's accessibility requirements.

first occupancy after January 26, 1993, and are "place[s] of public accommodation" within the meaning of Section 301(7)(E) of the ADA, 42 U.S.C. § 12181(7)(E).

4.  This Consent Decree does not constitute any admission of liability on the part of any of the Defendants.

## II. DEFENDANTS

5.  Defendant Lanzce G. Douglass developed the Rock Creek, Granite Court, Prairie Hills, and Hilby Station Apartments and was responsible for their design and construction. Defendants Douglass, Inc. and Prairie Hills, LLC owned Prairie Hills during its design and construction and have continued to own it since that time.  Defendant Hilby Station, LLC  owned Hilby Station Apartments during its design and construction and has continued to own it since that time.  For purposes of this Decree, these Defendants shall be collectively known as the "Douglass Defendants."

6.  Donald E. Neraas, an architect, prepared architectural drawings for Phase I of the Rock Creek Apartments.   Mr. Neraas died in December 2007.  On March 28, 2008, the Court entered an Order substituting as a defendant Beverly Neraas, as the personal representative and executor of Mr. Neraas' estate, for Mr. Neraas.  The Government contends that Donald E. Neraas participated in the design of the Prairie Hills Apartments in addition to that of Rock Creek. Defendant Neraas denies that Donald E. Neraas prepared any architectural drawings for the Prairie Hills Apartments.

7.  Defendant Independent Home Designs, Inc., a drafting company, altered drawings for the Hilby Station Apartments and participated in the design of that complex.  In addition, Independent Home Designs, Inc. is the successor corporation to Independent Designs, Inc., which  prepared architectural drawings for Phase II of the Rock Creek Apartments and for the Hilby Station Apartments and participated in the design of those complexes.

8.  Defendant Ralph W. Hoover was retained by Defendant Lanzce Douglass as an architect for Phase II of the Rock Creek Apartments, Phase I of the Prairie Hills Apartments and the Hilby Station Apartments and reviewed and approved architectural drawings for those

1   properties.

2       9.  Defendant J. R. Bonnett Engineering, Inc. prepared engineering plans for the public

3   and common use areas of the Granite Court Apartments and participated in the design of that

4   complex.

5       10.  Defendant Gary S. Nelson, an engineer, prepared engineering plans for the public

6   and common use areas of the Prairie Hills Apartments and participated in the design of that

7   complex.

8   ### III. RELEVANT REQUIREMENTS OF THE FAIR HOUSING ACT AND THE AMERICANS WITH DISABILITIES ACT

9

10      11.  The Fair Housing Act provides that, for non-elevator residential buildings with four

    or more dwelling units, all ground floor units that are designed and constructed for first

11  occupancy after March 13, 1991, are "covered units" and must include certain basic features of

12  accessible and adaptable design to make such units usable by a person who has or who develops

13  a disability.  42 U.S.C. §§ 3604(f)(3)(C) and (f)(7)(B).

14      12.  The accessible and adaptable design provisions of the Fair Housing Act require that

15  for covered multifamily dwellings:  (i) the public use and common use portions of such

16  dwellings are readily accessible to and usable by persons with a disability; (ii) all the doors

17  designed to allow passage into and within all premises within such dwellings are sufficiently

18  wide to allow passage by persons with a disability using wheelchairs; and (iii) all premises

19  within such dwellings contain the following features of adaptive design: (I) an accessible route

20  into and through the dwelling; (II) light switches, electrical outlets, thermostats, and other

21  environmental controls in accessible locations; (III) reinforcements in bathroom walls to allow

22  later installation of grab bars; and (IV) usable kitchens and bathrooms such that an individual

23  using a wheelchair can maneuver about the space.  42 U.S.C. § 3604(f)(3)(C).  These features are

24  referenced in this document as the "FHA accessible design requirements."

25      13.  The ADA requires that places of public accommodation designed and constructed for

26  first occupancy after January 26, 1993 be readily accessible to and usable by individuals with

27  disabilities. See 42 U.S.C. § 12183(a)(1), 28 C.F.R. Part 36, Appendix A.

28

- 4 -

**IV.  VIOLATIONS AT THE SUBJECT PROPERTIES**

14.   The United States has surveyed the four subject properties and has identified failures to meet the FHA accessible design requirements and the requirements of the ADA.  For example, there are steps leading to covered apartments at Rock Creek; there are excessively steep walkways leading to covered apartment entrances and other public and common use areas; bedroom, bathroom, and walk-in closet doors within some covered apartments are too narrow for passage by persons in wheelchairs; there is insufficient maneuvering space for wheelchairs in kitchens and bathrooms in some covered apartments;  thermostats in some covered apartments are mounted too high for wheelchair users; and, with the exception of one apartment in Hilby Station, there are no grab bar reinforcements in any of the bathrooms in the covered apartments. The Defendants have therefore agreed to take the corrective measures designated below.

**V.  CONSENT OF THE PARTIES TO ENTRY OF THIS DECREE**

15.   The parties agree that this Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. §§ 1331 and 1345, 42 U.S.C. § 3614(a) and 42 U.S.C. § 12188(b)(1)(B).  The parties have negotiated a settlement such that the controversy will be resolved without further proceedings and without an evidentiary hearing.  Accordingly, the parties have jointly consented to the entry of this Consent Decree as indicated by the signatures appearing below.

16.   The Douglass Defendants have entered into a separate settlement agreement with Defendants Beverly Neraas, Independent Home Designs, Inc., Ralph W. Hoover, J. R. Bonnett Engineering, Inc., and Gary S. Nelson.  Pursuant to that agreement, the Douglass Defendants are solely responsible to the government for the obligations set forth in Sections VII and X of this Consent Decree.  Also pursuant to that agreement, the Douglass Defendants and the other defendants have determined among themselves that the Douglass Defendants shall pay the entire amount required by paragraphs 19 and 37 of this Decree.

Therefore, it is hereby ORDERED, ADJUDGED and DECREED:

## VI.  GENERAL INJUNCTION

17.  Defendants, their officers, employees, agents, successors and assigns and all other persons in active concert or participation with any of them are hereby enjoined from discriminating on the basis of disability as prohibited by the Fair Housing Act, 42 U.S.C. § 3604(f)(1)-(3).

18. The Douglass Defendants are hereby enjoined from discriminating on the basis of disability as prohibited by Title III of the ADA, 42 U.S.C. § 12183(a)(1).

## VII.  MODIFICATIONS OF SUBJECT PROPERTIES

### (A)  Public and Common Use Areas

19.  Within one year from the date of entry of this Decree, the Douglass Defendants shall complete the modifications to the public and common use areas of the Rock Creek, Prairie Hills, Granite Court, and Hilby Station Apartments as set forth in Appendix A (1)-(4).  The Douglass Defendants shall pay all expenses associated with these modifications and shall attempt, in good faith, to minimize any inconvenience to the residents of the complexes.  The Douglass Defendants shall provide notice to all residents of the subject properties of the retrofits to the public and common use areas by delivering a "Notice" substantially in the form of Appendix B fifteen (15) days prior to beginning the retrofits.

### (B)  Dwelling Units

20.  As soon as reasonably possible after entry of the Consent Decree, but in any event not more than fifteen (15) months from the date of entry of this Decree, the Douglass Defendants shall complete the retrofits of the interiors of the covered units at the subject properties as set forth in Appendix A (1)-(4) of the Decree, even if there has not been a vacancy in those units and even if the tenants have not requested any retrofits.

21.  Within thirty (30) days of the entry of this Decree, the Douglass Defendants shall provide notice to all residents of covered ground floor apartments at the subject properties by delivering a "Notice" substantially in the form of Appendix C informing them of the planned retrofits and offering them the opportunity to request that such retrofits be completed in the unit.

Upon such request, the Douglass Defendants shall complete the retrofits as promptly as practical, but in any event, not later than twenty-one (21) days following the receipt of the written request.

22.  The Douglass Defendants shall pay all expenses associated with the above modifications and shall attempt, in good faith, to minimize any inconvenience to the residents. In the event a resident of a unit scheduled to undergo such modification as required herein incurs undue inconvenience or hardship (defined as a required dislocation from the unit for more than twenty-four (24) hours consecutively), the Douglass Defendants will pay such resident the applicable government per diem rate for food and lodging for the local area for each day of undue inconvenience or hardship.  Such payment shall be made prior to the commencement of any retrofit work on the resident's unit, so that the resident can use the money to obtain alternative living accommodations while dislocated.

23.  The Douglass Defendants may not charge any additional rent, deposit or other fee for retrofits scheduled or completed in the units.

**(C) Inspection of Retrofits**

24.  The Douglass Defendants shall enter into a contract with a neutral inspector approved by the United States (hereinafter "Inspector") to conduct on-site inspections of the retrofits that have been performed under this Decree to determine if the retrofits have been completed in accordance with the specifications in Appendix A (1)-(4).  Such Inspector shall have expertise in the design and construction requirements of the Fair Housing Act and the ADA and its implementing regulations.

25.  The inspections of the public and common use areas shall take place within fourteen (14) months following entry of this Consent Decree and the inspections of the unit interiors shall take place within eighteen months following the entry of this Decree.  The Douglass Defendants shall give the United States at least three (3) weeks notice of the inspections and shall give the United States an opportunity to have its representative present for the inspections.

26.  The Inspector shall set out the results of each inspection, including deficiencies, if

any, in writing, and shall send that report by mail and by fax to counsel for the United States[2]
and the Douglass Defendants.  If the inspection indicates that not all of the required retrofits
have been made as specified in Appendix A (1)-(4) within the time frame indicated in the
construction schedule, the Douglass Defendants shall correct any deficiencies within a
reasonable period as determined by the Inspector, subject to the approval of the United States.
The Douglass Defendants shall pay for another inspection by the same Inspector to certify that
the deficiencies have been corrected.  This process shall continue until the Inspector certifies that
all of the necessary modifications have been made.  The Douglass Defendants shall pay all fees
and costs associated with these inspections, and such payments shall be made without regard to
the Inspector's findings.  Upon reasonable notice to the Douglass Defendants, representatives of
the United States shall be permitted to inspect the modifications in accordance with this Consent
Decree or the third-party inspection reports provided for in this Decree, to ensure compliance;
provided, however, that the United States shall endeavor to minimize any inconvenience caused
by such inspections.

**(D)  Sale or Transfer of an Ownership Interest in Covered Properties**

27.  The sale or transfer of ownership, in whole or in part, of any of the subject properties
shall not affect the Douglass Defendants' continuing obligations during the period of the
Consent Decree to retrofit the properties as specified in this Decree, unless they have obtained,
in writing, as a condition of sale or transfer, the purchaser or transferee's commitment to be
bound by the terms of the Consent Decree to complete all required retrofits specified in
Appendix A (1)-(4).  Should the Douglass Defendants decide to sell or transfer any ownership
interest in the properties, in whole or in part, prior to the completion of the required retrofits,
they shall, at least thirty (30) days prior to completion of the sale or transfer:  (a) provide to each
prospective purchaser or transferee a copy of this Consent Decree, along with written notice that

[2]  For purposes of this Decree, all submissions to the United States or its counsel should
be submitted to: Chief, Housing and Civil Enforcement Section, Civil Rights Division, United
States Department of Justice, 950 Pennsylvania Avenue, N.W. - NWB, Washington, D.C. 20530,
Attn: DJ# 175-81-33, or as otherwise directed by the United States.

the subject property is subject to the Decree, including specifically the Douglass Defendants'
obligations to complete required retrofit work and to allow inspections, or to obtain the
purchaser's or transferee's commitment, in writing, to be bound by the requirements of this
Decree; and (b) provide to the United States, by electronic and first class mail, written notice of
its intent to sell or transfer ownership, along with a copy of the notice sent to each purchaser or
transferee, and each purchaser's or transferee's name, address and telephone number.

**(E)  Additional Retrofits to Be Completed On Request**

28.  Upon request of a resident with a physical disability who resides or will reside in
Prairie Hills, Granite Court, or Hilby Station, the Douglass Defendants shall convert two garages
into one accessible garage and make that garage available to the resident at the same cost as
other residents are charged for a single garage.

29.  Upon request of a resident with a physical disability who resides or will reside in
Rock Creek, the Douglass Defendants shall restripe one carport to provide an ANSI compliant
accessible parking space and access aisle at the carport, and shall also provide a compliant curb
ramp connecting that space to an accessible route.

30.  Upon request of a resident with a physical disability who resides or will reside in a
ground floor apartment unit at one of the subject properties, the Douglass Defendants shall
install grab bars with surface mounted Wing-its at the toilet and tub in the relevant bathroom(s).
The Douglass Defendants shall purchase and store for this purpose 60 grab bars and
accompanying surface mounted Wing-its and shall replenish the grab bars and Wing-its as they
are used.[3]

31.  Upon request of a resident with a physical disability who resides or will reside in a
ground floor unit at one of the subject properties, the Douglass Defendants shall provide a
removable base cabinet, finish flooring, and insulate pipes in units with inaccessible lavatories in
lieu of installing an offset sink with a centerline as close as possible to 24 inches from the side
wall (*see* Appendix A) for a forward approach to the sink.

---

[3]  The 60 grab bars and accompanying Wing-its are for the four properties combined.

32.   Upon request of a resident with a physical disability who resides or will reside in a ground floor unit at Building A or B of Rock Creek, the Douglass Defendants shall replace the sliding glass patio door with an ANSI compliant minimum 36" wide swing door equipped with accessible levered hardware on the exterior side.

33.   The Douglass Defendants shall revise the promotional materials that are provided to prospective residents to advise them of the options listed above in paragraphs 28 to 32.

### VIII.  NON-DISCRIMINATION IN FUTURE DESIGN AND CONSTRUCTION

34.   During the term of this Consent Decree, the Douglass Defendants shall maintain and provide to the United States the following information and statements regarding any covered, multifamily dwellings intended to be, developed, built, designed, and/or engineered in whole or in part, by them or by any entities in which they have a position of control as an officer, director, member, or manager, or have a ten percent (10%) or larger ownership share.  To satisfy this reporting obligation, the Douglass Defendants shall provide the following information to the United States thirty (30) days after entry of this Decree, one year after entry of this Decree, and then annually for the remainder of the term of this Decree, with respect to any covered multifamily dwelling project:

(a) the name and address of the multifamily dwelling projects;

(b) a description of the project and the individual units;

(c) the name, address and telephone number of any site engineer(s) and/or civil engineer(s) involved with the project;

(d) a statement from all site engineers and/or civil engineers involved with the project acknowledging and describing his/her knowledge of and training in the requirements of the Fair Housing Act and the ADA in the field of accessible building and housing design and stating that he/she has reviewed the design plans, drawings or blueprints for the project and that to the best of his/her professional judgment, knowledge and belief the design specifications therein comply with the requirements of Section 804(f)(3)(C) of the Fair Housing Act, and, where applicable, the ADA, and the ADA Standards for Accessible Design.  The Douglass Defendants can satisfy

this requirement by including such a statement in the contract with the site engineer and/or civil engineer, and by requiring that the site engineer and/or civil engineer execute the contract.

(e) the name, address and telephone number of the architect(s) involved with the project; and

(f) a statement from all architects involved with the project acknowledging and describing his/her knowledge of and training in the requirements of the Fair Housing Act and the ADA in the field of accessible building and housing design and stating that he/she has reviewed the architectural plans for the project and that to the best of his/her professional judgment, knowledge and belief the design specifications therein comply with the requirements of Section 804(f)(3)(C) of the Fair Housing Act, and, where applicable, the ADA and the ADA Standards for Accessible Design.  The Douglass Defendants can satisfy this requirement by including such a statement in the contract with the architect, and by requiring that the architect execute the contract.

(g) if the engineering documents or architectural plans are revised, and the revisions could have an impact on the accessibility of the dwellings or complex, defendants shall obtain and maintain, and provide to the United States upon request, a statement from the site engineer(s) or architect(s), as applicable, who are responsible for such revisions, that to the best of his/her professional judgment, knowledge and belief the design specifications therein comply with the requirements of Section 804(f)(3)(C) of the Fair Housing Act, and, where applicable, the ADA and the ADA Standards for Accessible Design.

35.  For the term of this Decree, if Independent Home Designs, Inc., or Ralph W. Hoover prepares any architectural or site plans, drawings, or blueprints for covered multifamily housing, the relevant Defendant, his/its members, employees and agents shall include on such plans, drawings or blueprints a statement that they comply with the Fair Housing Act and, where applicable, the ADA.  During the term of this Decree, Defendants Independent Home Designs, Inc. and Hoover shall, on request, provide to the United States a list of all such multifamily housing projects such Defendant has designed or is designing.

36.  For the term of this Decree, if Defendant J. R. Bonnett Engineering, Inc. or Gary S. Nelson prepares any site plans, drawings, or blueprints for covered multifamily housing, including the exterior and/or common use portions of such housing, the relevant Defendant, its/his employees and agents shall include on such plans, drawings or blueprints a statement that they comply with the Fair Housing Act and, where applicable, the ADA.  During the term of this Decree, Defendants J. R. Bonnett Engineering, Inc. and Nelson shall, on request, provide to the United States a list of all such multifamily housing projects such Defendant has designed or is designing.

## IX.  DAMAGES FOR AGGRIEVED PERSONS

37.  Within ten (10) days of the entry of this Decree, the Douglass Defendants shall deposit into an interest bearing escrow account the sum of one hundred twenty thousand dollars ($120,000) for the purpose of paying damages to any aggrieved persons who may have been harmed as a result of Defendants' failure to design and construct the subject properties in compliance with the FHA and the ADA.

38.  Within thirty (30) days of the entry of this Decree, the Douglass Defendants shall send by first-class mail, postage prepaid, a copy of a "Notice" substantially in the form of Appendix D to each existing tenant of the ground-floor apartments at the subject properties and to the last known address of any past tenant of a ground-floor unit who resided in said unit at any time after January 1, 2000.  Within forty-five (45) days of entry of this Decree, the Douglass Defendants shall provide to counsel for the United States proof that the Notice has been sent.  The Douglass Defendants shall make available for inspection and copying any additional documents not previously made available that may reasonably assist in the identification of aggrieved persons.  Nothing in this section shall preclude the United States from making its own efforts to locate and provide notice to potential aggrieved persons.

39.  Potential aggrieved persons shall be informed that they have 150 days from the date of entry of this Decree to contact the United States in response to the Notice.  The United States shall investigate the claims of potential aggrieved persons and, within 210 days from the entry of

this Decree, shall make a preliminary determination as to which persons are aggrieved and an appropriate amount of damages to be paid to each such person from the damages fund. The United States will inform the Douglass Defendants in writing of its preliminary determinations, together with a copy of a sworn declaration from each potential aggrieved person setting forth the factual basis of the claim. The Douglass Defendants shall have thirty (30) days to review the declaration and provide the United States with any documents or information they believe may refute the claim.

40. After receiving the Douglass Defendants' comments, the United States shall submit its final recommendations to the Douglass Defendants and to the Court for its approval, together with a copy of the declarations and any additional information submitted by the Douglass Defendants. When the Court issues an order approving or changing the United States' proposed distribution of funds for aggrieved persons, the Douglass Defendants shall, within ten (10) days of the Court's order, deliver to the United States checks payable to the aggrieved persons in the amounts approved by the Court. In no event shall the aggregate of all such checks exceed the sum of the damages fund, including accrued interest, provided for in paragraph 37 of this Decree. No aggrieved person shall be paid until he or she has first executed and delivered to counsel for the United States a release consistent with the release form set forth in Appendix E.

41. Within forty-five (45) days of receipt by the United States of the checks made payable to the aggrieved persons in the amounts approved by the Court, the remainder of the damages fund, if any, shall revert to the Douglass Defendants.

## X.  CIVIL PENALTY

42. Within five (5) days of the date of entry of this Decree, the Douglass Defendants shall jointly pay to the United States a civil penalty of ten thousand dollars ($10,000) to vindicate the public interest, pursuant to 42 U.S.C. §3614(d)(1)(C). This sum shall be paid by submitting to counsel for the United States a check made payable to the "United States of America."

## XI.  EDUCATIONAL PROGRAM

43. Within thirty (30) days of the entry of this Decree, Defendants, with the exception of

Defendant Neraas, shall provide a copy of this Decree to all their agents and employees who have supervisory authority over the design or construction of covered multifamily dwellings (and, for the Douglass Defendants, all agents or employees involved in the rental of covered multifamily dwellings) and  secure the signed statement from each agent or employee acknowledging that he or she has received and read the Decree, and had an opportunity to have questions about the Decree answered.  This statement shall be substantially in the form of Appendix F.

44.  During the term of this Decree, within thirty (30) days after the date he or she commences an agency or employment relationship with Defendants, with the exception of Defendant Neraas, each new agent or employee who will have supervisory authority over the design or construction  (and, for the Douglass Defendants all new agent or employees involved in the rental of covered multifamily dwellings)  shall be given a copy of this Decree and be required to sign a statement substantially in the form of Appendix F acknowledging that he or she has received and read the Decree, and had an opportunity to have questions about the Decree answered.

45.  With the exception of Defendant Neraas, Defendants shall also ensure that they and any other employees and agents who have supervisory authority over the design and/or construction of covered multifamily dwellings have a copy of, are familiar with, and personally review, the Fair Housing Accessibility Guidelines, 56 Fed. Reg. 9472 (1991) and the United States Department of Housing and Urban Development, Fair Housing Act Design Manual, *A Manual to Assist Builders in Meeting the Accessibility Requirements of the Fair Housing Act*, (August 1996, Rev. April 1998).

46.  Within one hundred twenty (120) days of the date of entry of this Consent Decree, Defendants, with the exception of Defendant Neraas, and all employees and agents whose duties, in whole or in part, involved supervisory authority over the development, design and/or construction of the multifamily dwellings at issue in this case shall undergo training on the design and construction requirements of the Fair Housing Act.  For the Douglass Defendants,

such training shall also include all employees and agents whose duties, in whole or in part, involve the rental of apartments at any of the subject properties and shall include training on those portions of the Fair Housing Act that relate to accessibility requirements.  A qualified third party, unconnected to Defendants or their employees, agents or counsel, and approved by the United States, shall conduct the training, and any expenses associated with this training shall be borne by Defendants.  Defendants shall provide to the United States, within thirty (30) days after the training, copies of the training outlines and any materials distributed by the trainers; and certifications executed by all Defendants and covered employees and agents confirming their attendance, in a form substantially equivalent to Appendix G.

## XII.  PUBLIC NOTICE OF NON-DISCRIMINATION POLICY

47.  During the term of this Decree, the Douglass Defendants shall post and prominently display the federal Fair Housing Poster, as described in 24 C.F.R. 110.15 and 110.25,  in the leasing offices of the subject properties and in any other sales or rental offices of all dwellings owned or operated by them, if any, and in any other place in which persons may inquire about renting dwellings from them.

48.  For the duration of this Consent Decree, in all future advertising in newspapers where the advertisement is more than two square inches, on pamphlets, brochures and other promotional literature, and on any internet website regarding the subject and other existing properties, or any new covered complexes that the Douglass Defendants may design, develop or construct, the Douglass Defendants shall place, in a conspicuous location, a statement that the dwelling units include features for persons with disabilities required by the federal Fair Housing Act.

## XIII.  ADDITIONAL MONITORING REQUIREMENTS

48.  For the duration of this Decree, Defendants, with the exception of Defendant Neraas, shall advise counsel for the United States in writing within thirty (30) days of receipt of any written complaint against them, their employees or agents, involving, or potentially involving, discrimination regarding housing on the basis of disability under the Fair Housing Act or, where

applicable, the ADA.  The Defendants shall also promptly provide the United States all non-privileged information it may request concerning any such complaint.  Within fifteen (15) days of the resolution of any such complaint,  Defendants shall advise counsel for the United States that a resolution has been reached.

49.  For the duration of this Decree, Defendants, with the exception of Defendant Neraas, are required to preserve all records related to this Decree regarding the subject properties, and all future covered multifamily dwellings to be designed, constructed, owned, operated or acquired by them independently or jointly during the period of the Decree.  Upon reasonable notice to Defendants, representatives of the United States shall be permitted to inspect and copy any of Defendants' non-privileged records or inspect any covered dwelling or any covered public and common use areas under Defendants' control at reasonable times so as to determine compliance with the Consent Decree.

50.  Within 180 days after the entry of this Decree, Defendants, with the exception of Defendant Neraas, shall submit an initial report containing the signed statement certifications of attendance for Defendants, their officers, and supervisory design and/or construction personnel, who have completed the education program specified in Section XI of this Consent Decree. Thereafter, during the term of this Decree, Defendants shall, one year after entry, two years after entry, and two years and 10 months after entry, submit to the United States a report containing the signed statements of new employees and agents involved in the design and/or construction of multifamily dwellings certifying that, in accordance with Section XI, they have received and read the Decree and had an opportunity to have questions about the Decree answered.

## XIV.  DURATION OF DECREE AND TERMINATION OF LEGAL ACTION

51.  This Consent Decree shall remain in effect for three (3) years after the date of its entry.

52.  The Court shall retain jurisdiction for the duration of this Consent Decree to enforce the terms of the Decree, after which time the case shall be dismissed with prejudice.  The United States may move the Court to extend the duration of the Decree in the interests of justice.

53.  The parties shall endeavor in good faith to resolve informally any differences regarding interpretation of and compliance with this Decree prior to bringing such matters to the Court for resolution.  However, in the event of a failure by a Defendant to perform in a timely manner any act required by this Decree or otherwise to act in conformance with any provision thereof, any party may move this Court to impose any remedy authorized by law or equity, including, but not limited to, an order requiring performance of such act or deeming such act to have been performed, and an award of any damages, costs, and reasonable attorneys' fees which may have been occasioned by the violation or failure to perform.

## XV.  TIME FOR PERFORMANCE

54.  Any time limits for performance imposed by this Consent Decree may be extended by the mutual agreement, in writing, of the United States and the relevant Defendant.

## XVI.  COSTS OF LITIGATION

55.  Each party to this litigation will bear its own costs and attorney's fees associated with this litigation.

**IT IS SO ORDERED:**

This 26th day of May, 2009.


s/Lonny R. Suko
_____
LONNY R. SUKO
United States District Judge

1       Agreed to by the parties as indicated by the signatures below.

2  FOR PLAINTIFF UNITED STATES:

FOR DEFENDANTS LANZCE G.
DOUGLASS; LANZCE G. DOUGLASS,
INC.; PRAIRIE HILLS, LLC; AND HILBY
STATION, LLC:

LORETTA KING
Acting Assistant Attorney General
Civil Rights Division

*/s/Theresa L. Kitay with permission*
THERESA L. KITAY, ESQ.
578 Washington Blvd., Suite 836
Marina del Rey, CA 90292
310-578-9134/770-454-0126 - fax

*/s/Nancy F. Langworthy*
DONNA M. MURPHY
Acting Chief
TIMOTHY J. MORAN
Deputy Chief
NANCY F. LANGWORTHY
Attorney
United States Department of Justice
Civil Rights Division
Housing & Civil Enforcement Section
950 Pennsylvania Avenue, N.W. – NWB
Washington, D.C. 20530
202-616-8925/202-514-1116 - fax

Date: May 20, 2009

FOR DEFENDANT BEVERLY NERAAS,
as Personal Representative and Executor of the
Estate of DONALD E. NERAAS:

*/s/John H. Guin with permission*
JOHN H. GUIN, ESQ.
LAW OFFICE OF JOHN H. GUIN, PLLC
9 S. Washington, Suite 720
Spokane, WA 99201
509-747-5250/509-747-5251 - fax

Date: May 20, 2009

*/s/ Pamela J. DeRusha*
JAMES A. McDEVITT
United States Attorney
PAMELA J. DERUSHA
Assistant United States Attorney
P.O. Box 1494
Spokane, WA 99210
509-353-2767/509-353-2766 - fax

Date: May 20, 2009

Date: May 20, 2009

FOR DEFENDANT INDEPENDENT HOME
DESIGNS, INC.:

/s/Kimberly A. Kamel with permission
KIMBERLY A. KAMEL, ESQ.
Witherspoon, Kelley, Davenport & Toole, P.S.
1100 U.S. Bank Building
422 West Riverside Avenue
Spokane, WA 99201
509-624-5265/509-458-2728 - fax

Date: May 20, 2009

FOR DEFENDANT RALPH W. HOOVER

/s/Richard D. Campbell with permission
RICHARD D. CAMPBELL, ESQ.
Campbell, Bissell & Kirby, PLLC
7 S. Howard Street
Suite 416
Spokane, WA 99201
509-455-7100/509- 509-455- 7111- fax

Date: May 20, 2009

FOR DEFENDANT J. R. BONNETT
ENGINEERING, INC.

/s/Carl E. Hueber with permission
CARL E. HUEBER, ESQ.
Winston & Cashatt
601 W. Riverside
Suite 1900
Spokane, WA 99201
509-838-6131/509- 838-1416- fax


Date: May 20, 2009

FOR DEFENDANT GARY S. NELSON

/s/Geoffrey D. Swindler with permission
GEOFFREY D. SWINDLER, ESQ.
Law Office of Geoffrey D. Swindler
316 W. Boone Avenue
Suite 880
Spokane, WA 99201
509-326-7700/509-326-7503 - fax

Date: May 20, 2009

**APPENDIX A (1)**
**ROCK CREEK APARTMENTS**

**PUBLIC AND COMMON USE AREAS**

**RENTAL OFFICE/CLUBHOUSE**

Provide ADA compliant van-accessible stall and 8' wide striped access aisle with appropriate signage mounted at minimum height of 5' at Rental Office.  Regrade landing at bottom of curb ramp so that cross slope does not exceed 2 % and add cane detectable warnings. [ADA Standards §§ 4.1.2(5), 4.6; FHAG Req. 1; ANSI A117.1- 1986 4.3, 4.7.7, 4.8.6]

Replace hardware on entry door to Rental Office with accessible lever style hardware. [FHAG 2; ANSI A117.1-1986 4.13.9.]

Modify or replace threshold at entries to Rental Office so that threshold is a maximum ½" high with a 1:2 beveled transition. [FHAG Req. 1; ANSI A117.1-1986 4.3.8.]

**PHASE I – BUILDINGS A AND B**

Create accessible route to all ground floor units in Buildings A and B as shown on attached accessible route plan, including at least one ANSI compliant accessible parking stall and curb ramp for both buildings with appropriate sign mounted at minimum height of 5'; add or extend walkways as necessary to provide ANSI compliant accessible route from accessible stall at each building to rear patio doors of the ground floor dwellings (see attached accessible route plan); add walkways and curb ramps where necessary to provide ANSI compliant continuous accessible route from patio-side entrances at Buildings A and B to Rental Office/Clubhouse in Phase II;[4] add a concrete walkway connecting the existing walkway located along the head of the carport parking spaces near Building B to the proposed new walkway along the parking side of Building C (see attached accessible route plan); install new compliant curb ramp at end of walkway along the side of Unit 112 in Building B to provide a continuous accessible route from ground floor units at Building B to all common use amenities (see plan); add compliant handrails

---

[4] The Consent Decree does not cover the accessibility features of the public sidewalk used to connect the entrances at Buildings A and B to the other public and common use areas of the property.

to each side of walkway at portion of walkway (ramp) at the patio side of Unit 111 in Building B that has slopes that exceed the maximum 8.33% at up to 8.6%; make new portions of walkways at least 36" wide; add lighting on side of Buildings A and B to light route to rear patios; modify cross slopes in excess of 3% to maximum 2%, specifically, reduce cross slopes (approximately 4.4%) on walkway patio side of Unit 112 to maximum 2%; reduce cross slopes at main walkway along side of Unit 112 (approximately 3.9 - 4.2%) and at walkway from Unit 112 to carport area (approximately 5.6%) to maximum 2%; reduce cross slopes (approximately 4.7 - 5% and 7%) at main walkway along the side of Unit 101 to maximum 2% and add maximum ½" high 1:2 beveled transition strip to address level change at end of walkway near Sitka Avenue.  Provide ANSI compliant curb ramp; add cane detectable railing at or below 27" at undersides of stairs at breezeways at Buildings A and B.

Replace hardware at front entries of all ground floor units with accessible lever style hardware.

Provide mail delivery to residents with disabilities and notice of mail delivery for persons with disabilities to prospective tenants.

Provide fire extinguishers at the breezeways leading to the ground floor dwelling units that do not protrude into the accessible route of each building. [FHAG Req. 1; ANSI A117.1-1986 § 4.4.]

**PHASE II – BUILDINGS C-F**

Create accessible route to all ground floor units in Buildings C, D, E, and F as shown on attached plan; add walkways and curb ramps where necessary to provide ANSI compliant continuous accessible route from front (breezeway) entrances at Buildings C, D, E and F to mailbox kiosk and Rental Office/Clubhouse (see attached route plan).

Add cane detectable railing at or below 27" at undersides of stairs at breezeways at Buildings C, D, E and F.

At mailbox kiosk,  replace or modify curb ramp so that slope does not exceed 8.33 % and add maximum ½" high 1:2 beveled transition strip where curb ramp connects to drive.

At mailbox kiosk, add new outgoing mail slot with 30" by 48" clear floor space for a forward or

side approach.

Widen and re-stripe accessible stall at Building E to provide minimum 8' wide space with a 5' wide access aisle and add appropriate sign mounted at minimum 5' height.

Reduce excessive cross slopes (approximately 3.5 and 4.2%) in access aisle of accessible stall at Building F to maximum 2%.

At Buildings C, D, E, and F, add connecting walkways to provide an accessible route from front (breezeway) entries to the mailboxes and trash facilities.  Add ANSI compliant curb ramp at entry walkway to unit 130.

Modify or replace curb ramps at entry walkways to units 137-140 so that slope does not exceed 8.33% and provide 1:2 beveled transition strip at maximum ½" high where ramp meets asphalt.

Provide fire extinguishers at the breezeways leading to the ground floor dwelling units that do not protrude into the accessible route of each building. [FHAG Req. 1; ANSI A117.1-1986 § 4.4.]  [ANSI A117.1-1986 4.26]

**APPENDIX A (1)**
**ROCK CREEK APARTMENTS**

**APARTMENT INTERIORS**

For all ground floor units in Buildings A and B, key exterior lock at patio side sliding glass door; replace sliding glass door with ANSI compliant  minimum 36" wide swing door equipped with accessible levered hardware on exterior side, on request.  Provide ANSI compliant threshold maximum 3/4" height at 1:2 beveled threshold at patio side door.

Modify interior side of swing door at primary entrance to maximum allowable threshold height of  3/4" with 1:2 beveled transition.

In standard "Slate" 1 BR/1BA apartments and standard "Shale" 2BR/1BA apartments (Phase I):

> lower thermostats to maximum 48" high, on turnover,  provided retrofit occurs within fifteen (15) months, or, if requested, upon request;

> widen or otherwise modify bedroom and bathroom doors to provide as close to minimum 31 5/8" clear width as possible by installing offset/swing clear hinges, and modify door frame casing;

> reverse swing of bathroom door to increase maneuvering space within bathroom;

> move toilet using offset flange so that the centerline of toilet is as close to 18" from wall as possible;

> provide 36" wide opening at kitchen;

> in hall closet, install shelf or shoe rack to lessen depth of closet.

In "accessible" "Slate" apartment:

> provide removable cabinets and finished floor space at cabinets adjacent to kitchen sink to increase clear floor space; replace refrigerator with countertop depth model to provide as close to 30 x 48" clear floor space as possible;

> provide 30 x 48" clear floor space centered on range; rotate orientation of range to wall opposite sink (provided centered approach and as close as possible to 39" inch clearance, with knee space at sink opposite);

on turnover, provided retrofit occurs within fifteen (15) months, or, if requested, upon

request, remove skirt board under sink to provide 28 ½" high knee space.

In standard "Onyx" 2BR/2 BA units (Phase I):

lower thermostats to maximum 48" high;

widen or otherwise modify bedroom and bathroom doors to provide as close to minimum

31 5/8" clear width as possible by installing offset/swing clear hinges, and modify door

frame casing;

reverse swing of hall bathroom door to increase maneuvering space within bathroom;

increase clear floor space at lavatory by installing offset sink with centerline as close as

possible to 24" from side wall (but in no case will the centerline be less than 20" from

side wall), or provide removable base cabinet, finish flooring, and insulate pipes (if

defendants choose the offset sink, they will on request provide a removable base cabinet,

finish flooring, and insulate pipes);

in master bathroom, move baseboard heater or replace with a recessed model to provide

36"  wide accessible route at entry area; increase centered clear floor space at the range

by making adjacent cabinet removable and finishing floor or by moving location of

range;

In "accessible" "Onyx" 2BR/2BA:

increase centered clear floor space at the range by rotating range to face sink (which

creates centered clear floor space at range);

widen or otherwise modify bathroom door to provide as close to minimum 31 5/8" clear

width as possible by installing offset/swing clear hinges, and modify door frame casing;

in master bathroom, move baseboard heater or replace with a recessed model to provide

36"  wide accessible route at entry area;

on turnover, provided retrofit occurs within fifteeen (15) months, or, if requested, upon

request, remove skirt board under sink to provide 28 ½" high knee space;

In standard "Basalt" 1BR/1B (Phase II):

lower thermostats to maximum 48" high;

at patio door, install riser under floor covering so that threshold is maximum 3/4" high with 1:2 beveled transition strip;

in hall closet, install shoe rack or shelf to lessen depth of closet;

reverse swing of bathroom door to be an outswinging bathroom door to increase maneuvering space within bathroom;

move toilet using offset flange so that centerline of toilet is as close to 18" to tub as possible;

increase clear floor space at lavatory by installing offset sink with centerline as close as possible to 24" from side wall (but in no case will the centerline be less than 20" from side wall), or provide removable base cabinet, finish flooring, and insulate pipes (if defendants choose the offset sink, they will on request provide a removable base cabinet, finish flooring, and insulate pipes);

In standard "Cobblestone" 1BR/1BA apartments (Phase II):

lower thermostats to maximum 48" high;

at sliding glass patio door, install riser under floor covering so that threshold is maximum 3/4" high with 1:2 beveled transition strip;

In "accessible" "Cobblestone" 1BR/1BA:

at sliding glass patio door, install riser under floor covering so that threshold is maximum 3/4" high with 1:2 beveled transition strip;

widen or otherwise modify master bedroom door to provide as close to minimum 31 5/8" clear width as possible by installing offset/swing clear hinges, and modify door frame casing.

In standard "Granite" 2BR/2 BA (Phase II):

lower thermostats to maximum 48" high;

at sliding glass patio door, install riser under floor covering so that threshold is maximum 3/4" high with 1:2 beveled transition strip;

widen or otherwise modify bedroom and bathroom doors to provide as close to minimum 31 5/8" clear width as possible by installing offset/swing clear hinges, and modify door frame casing;

in closet off master bathroom, install shelf or shoe rack to lessen depth of closet;

reverse swing of hall bathroom door to be outswinging door to increase maneuvering space within bathroom;

in hall bathroom, install flush mounted heater to provide 30" x 48" clear floor space perpendicular to the bathtub;

in hall and master bathrooms, increase clear floor space at lavatory by installing offset sink with centerline as close as possible to 24" from side wall (but in no case will the centerline be less than 20" from side wall), or provide removable base cabinet, finish flooring, and insulate pipes;

in hall and master bathrooms, move toilets using offset flange so that centerline of toilet is as close to 18" from side wall as possible.

In "accessible" "Granite" 2BR/2B:

at sliding glass patio door, add 1:2 beveled transition strip at threshold;

widen or otherwise modify hall bathroom door to provide as close to minimum 31 5/8" clear width as possible by installing offset/swing clear hinges, and modify door frame casing.

In standard "Sandstone" 2BR/2BA:

lower thermostats to maximum 48" high;

at sliding glass patio door, install riser under floor covering so that threshold is maximum 3/4" high with 1:2 beveled transition strip;

reverse swing of hall bathroom door to increase maneuvering space within bathroom;

in hall bathroom, increase clear floor space at lavatory by installing offset sink with centerline as close as possible to 24" from side wall (but in no case will the centerline be less than 20" from side wall), or provide removable base cabinet, finish flooring, and

insulate pipes;

in hall bathroom, move toilet using offset flange so that centerline of toilet is as close to 18" from side wall as possible;

In "accessible" "Sandstone" 2BR/2B:

at patio door, install riser under floor covering so that threshold is maximum 3/4" high with 1:2 beveled transition strip;

in master bathroom, move toilet using offset flange so that centerline of toilet is as close to 18" from side wall as possible.

**APPENDIX A (2)**
**PRAIRIE HILLS APARTMENTS**


**PUBLIC AND COMMON USE AREAS**

**ACCESSIBLE ROUTES**

Consistent with the attached accessible route plan, add striped cross walks crossing vehicular drive at Buildings A, B, C, D, H, K and N so as to provide a continuous pedestrian accessible route from each of these buildings to the public and common use amenities, including the pool, trash, mail kiosk, community garden, basketball court, and Rental Office/Clubhouse.

Consistent with the attached accessible route plan, at Building A, reduce excessive cross slopes (approximately 3.4%) at driveways in front of  garage door nearest units 101 and 102 to 2% maximum; add compliant curb ramp at end of walkway leading to unit 101; and  remove "island" between garage doors of units 101 to 102 as per plan.

Consistent with the attached accessible route plan, at Building B, add compliant handrails on both sides of walkway leading to unit 105 and reduce excessive cross slopes (up to approximately 4.3 %) to maximum 2%; reduce excessive cross-slopes at driveways in front of private garage door nearest unit 106 (approximately 3.6-3.9%) and in front of private garage doors between units 107 and 108 (approximately 3.3-3.9%) to maximum 2%; reduce the level changes between the drive and the concrete island portions of the walkways between units 105-106 and 107-108 to a maximum 1/2" high with a 1:2 beveled transition.

Consistent with the attached accessible route plan, at Building C, reduce slope of curb ramp (approximately 14.9%) at end of entry walkway to units 113-116 to maximum 8.33% and reduce untreated level change to maximum 1/2" high with 1:2 beveled transition; reduce excessive cross slopes at main walkway leading from that entry walkway to the entry walkway at units 109-112 and 113-116 (up to 4.1%) to maximum 2%.  Also add one ANSI compliant HC parking space.

Consistent with the attached accessible route plan, at walkways leading to units 137-140 at Building F, reduce the level changes at curb ramp to a maximum 1/2" high with a 1:2 beveled

- 28 -

transition, and add one ANSI compliant HC parking space.

Consistent with the attached accessible route plan, at Building G, add one ANSI compliant HC parking space, and along the accessible route to trash area at Building M add ANSI compliant curb ramp at trash area.

Consistent with the attached accessible route plan, at Building H, provide compliant curb ramp at walkway leading to unit 152; modify and stripe asphalt driveway in front of the one private garage door nearest unit 152 in accordance with the accessible route plan.  Modify cross slopes in excess of 3% at concrete walkway in front of units 150 to152 to a maximum 2%.  Add ANSI compliant curb ramps at the concrete island between units 151 to 152.

Consistent with the attached accessible route plan, add a compliant curb ramp leading to trash bin enclosure across from Building I.  (The developer will relocate a trash disposal location along the accessible route to Building I).

Consistent with the attached accessible route plan, at Building J, reduce excessive slope of court side walkway leading to breeze way of units 165-168 (approximately 9.8% to 10.%) to 8.33% maximum, and add compliant hand rails on each side, or reduce running slope to 5% maximum.

Consistent with the attached accessible route plan, at Building K, reduce excessive slope of walkway at unit 1072 (up to 4.2%) to 2% maximum; modify landing to be level and 60" wide outside units 1070 and 1074, and provide a slope in all directions no greater than 2%; reduce the level change in the walkway to unit 1076 to 1/2" high maximum with a 1:2 beveled transition; add ANSI compliant curb ramp at mail box area, and provide ANSI compliant curb ramps at concrete island between units 1074 to 1076.

Consistent with the attached accessible route plan, at Building L, reduce the level changes in the curb ramp to units 1077-1080 to a 1/2" high maximum with a 1:2 beveled transition.

Consistent with the attached accessible route plan, at Building M, reduce the curb ramp level changes to 1/2" high maximum with a 1:2 beveled transition at units 1085-1088 and add one ANSI compliant HC parking space.

Consistent with the attached accessible route plan, at Building N, modify landings to be level

and 60" wide outside the primary entry doors to units 1096, 1098 and 1100 and  provide a slope in all directions no greater than 2%; reduce excessive cross slopes at driveways in front of attached garage doors between units 1094-1096 (up to 5.8%) to 2% maximum; and provide ANSI compliant curb ramps at concrete island between units 1094 to 1096.

Consistent with the attached accessible route plan, at Building O, on walkway leading to units 1105-1108, reduce running slopes that exceed 9 percent to 8.33% maximum, add compliant hand rails at each side of walkway, and provide a 60" long level landing at the top and bottom.

Consistent with the attached accessible route plan, at Building Q, modify the landing to be level and 60" wide outside the primary entry door to unit 1118, and provide a slope in all directions no greater than 2%.  Skim coat and remove curb on asphalt driveway in front of private garage doors between units 1118 to 1120.

Consistent with the attached accessible route plan, at Building R, reduce excessive cross slopes at units 1125-1128 (approximately 3.8%) to 2% maximum, and add a compliant route to the ground floor units from the accessible parking access aisle at Building S.

**BRIDGES**

Consistent with the attached accessible route plan, reduce excessive running slopes to 8.33% maximum at all bridges along the accessible route plan, add compliant handrails on each side and provide minimum 60" long level landing at top and bottom, or reduce running slope of bridges to 5% maximum, or otherwise provide accessible pedestrian route to basketball courts and other facilities accessed by bridges.

**RENTAL OFFICE AND CLUBHOUSE**

Modify landing to have 12" minimum maneuvering space outside Rental Office and Clubhouse. Add compliant signage on the latch side of the unisex restroom door, and modify the mirror to measure 40" maximum to the reflecting surface.

**OTHER FACILITIES (Pool, Basketball Court, Garden, Play Area,  etc.)**

Add compliant signage on the latch side of the unisex restroom door in the pool restroom, and relocate the grab bar so that it is a minimum 54" from the rear wall.

At second pool gate (across from Building I), provide accessible hardware. [FHAG Req. 1; ANSI A117.1-1986 §§ 4.13.6, Fig. 25.]

Reduce excessive cross slopes (up to 3.5%) at walkways from Building E to mail kiosks to 2% maximum; reassign all ground floor units with mail boxes in kiosk at Building I to lower boxes at Building E and all ground floor units with mail boxes in kiosk at Building S to lower boxes at building K; and add a compliant curb ramp to provide access to the mail kiosk from Building K. Reduce excessive cross slopes to 2% maximum in route from Buildings M and P to trash bin enclosures, and add a compliant curb ramp at the trash bin at Building S.

**PHASE I - BUILDINGS A THROUGH J**

Raise or add accessible parking sign mounted at 60" minimum at the accessible parking stall at Building E (entry units 125-128).

**PHASE II - BUILDINGS K THROUGH S**

Raise or add accessible parking sign mounted at 60" minimum at the accessible parking stalls at Buildings L (entry units 1077-1080), O (entry units 1105-1108) and, P (entry units 1109-1112).

**APPENDIX A (2)**
**PRAIRIE HILLS APARTMENTS**

**APARTMENT INTERIORS**

For all ground floor units in the complex, provide compliant transition at maximum 1/2" height and 1:2 beveled threshold at entry door and maximum 3/4" height at patio door. [FHAG 3 and 4; ANSI A117.1-1986 4.13.8.]

In standard Floor Plan 1 (2BR/2BA):

      lower thermostats to maximum 48" high;

In standard Floor Plan 2 (1BR/1BA):

      move toilet in bathroom, using offset flange, to provide as close to minimum 18" from

      centerline of toilet to side wall [FHAG Req. 7.];

      increase clear floor space at lavatory by installing offset sink with centerline as close as

      possible to 24" from side wall (but in no case will the centerline be less than 20" from

      side wall), or provide removable base cabinet, finish flooring, and insulate pipes;

In "accessible" Floor Plan 2 (1BR/1BA)

      move toilet in bathroom, using offset flange, to provide as close to minimum 18" from

      centerline of toilet to side wall [FHAG Req. 7.];

In standard Floor Plan 5 (2BR/2BA):

      move toilet at master bathroom and hall bathroom, using offset flange, to provide as close

      to minimum 18" from centerline of toilet to side wall [FHAG Req. 7.];

      increase clear floor space at lavatory in the hall bathroom by installing offset sink with

      centerline as close as possible to 24" from side wall (but in no case will the centerline be

      less than 20" from side wall), or provide removable base cabinet, finish flooring, and

      insulate pipes;

In "accessible" Floor Plan 5 (2BR/2BA):

      lower thermostats to maximum 48" high;

      at 42" deep (walk-in) closet off master bathroom, provide door opening of a minimum

31-5/8" width.  [FHAG Req. 3]

In standard Floor Plan 7 (2BR/2BA):

provide 36" wide route into master bathroom.

**APPENDIX A (3)**
**GRANITE COURT APARTMENTS**

**PUBLIC AND COMMON USE AREAS**

**PARKING**

Consistent with the attached route plan, install one ANSI compliant additional standard accessible parking space between Buildings A and B.

Raise sign at van accessible stall at leasing office to minimum height of 60" and include "van" designation.

**LEASING OFFICE**

Modify or replace threshold at entry to leasing office so that threshold is a maximum 1/2" high with a 1:2 beveled transition.

At rent drop slot near rental office entry door, add concrete pad in front of the drop slot so that there is at least 30" x 48" level clear floor space at the slot. Remove planter that is near door.

Replace hardware on entry doors to Rental Office/Clubhouse and interior door leading from Rental Office to Clubhouse lounge with accessible lever style hardware. [FHAG 2; ANSI A117.1-1986 4.13.9.]

**ACCESSIBLE ROUTES**

Consistent with the attached route plan, modify slope at corner of 4th Avenue and entry drive to reduce slope to maximum 8.33 %, fix small portions of broken concrete to provide stable, firm and slip resistant surface.

Add detectable warning per ADAAG to curb ramp at end of walkway at mailbox area leading to drive adjacent to van stall.

Add cane detectable railing at or below 27" at undersides of stairs at breezeways at each building.

Reduce cross slopes at the approximately one half of the walkway along side of the garage structure between buildings A and B that exceed 3% to a maximum 2 %.

Provide level landings at slope (bottom only) along side of unit 109 Building B; area is less than

- 34 -

6' long; slope shall be no more than 8.33% with landings.

## APPENDIX A (3)
## GRANITE COURT APARTMENTS

**APARTMENT INTERIORS**

For all ground floor units in complex, provide compliant transition at maximum 1/2" height and 1:2 beveled threshold at entry door and maximum 3/4" height at patio door. [FHAG 3 and 4; ANSI A117.1-1986 4.13.8.]

In standard Basalt Plan 1BR/1BA Apartments:

lower thermostats to maximum 48" high;

widen or otherwise modify bedroom and bathroom doors to provide as close to minimum 31 5/8" clear width as possible by installing offset/swing clear hinges, and modifying door frame casing;

reverse swing of bathroom door to increase maneuvering space within bathroom;

increase clear floor space at lavatory by installing offset sink with centerline as close as possible to 24" from side wall (but in no case will the centerline be less than 20" from side wall), or provide removable base cabinet, finish flooring, and insulate pipes;

In standard Cobblestone Plan 1BR/1BA Apartment:

lower thermostats to maximum 48" high;

widen or otherwise modify bedroom, bathroom and walk-in closet doors to provide as close to minimum 31 5/8" clear width as possible by installing offset/swing clear hinges, and modifying  door frame casing;

increase clear floor space at lavatory by installing offset sink with centerline as close as possible to 24" from side wall (but in no case will the centerline be less than 20" from side wall), or provide removable base cabinet, finish flooring, and insulate pipes (if defendants choose the offset sink, they will on request provide a removable base cabinet, finish flooring, and insulate pipes if a person with a disability needs a forward approach in order to use the sink);

In "accessible" Granite Plan 2BR/2BA Apartment (unit B-111):

increase clear floor space at lavatory in the master bathroom by installing offset sink with centerline as close as possible to 24" from side wall (but in no case will the centerline be less than 20" from side wall), or provide removable base cabinet, finish flooring, and insulate pipes (if defendants choose the offset sink, they will on request provide a removable base cabinet, finish flooring, and insulate pipes if a person with a disability needs a forward approach in order to use the sink);

**APPENDIX A (4)**
**HILBY STATION APARTMENTS**

**PUBLIC AND COMMON USE AREAS**

**PARKING**

Raise signs at all accessible stalls to at least 60" high; remove "van accessible" sign panel in front of units 109-111 and replace with standard accessible stall signage at least 60" high. Provide one accessible garage on request by converting two garages into one and renting at the price of a single garage.

**ACCESSIBLE ROUTES**

Add detectable warning on curb ramp near mailbox area leading to walkway leasing office. Provide ADA compliant curb ramp at van accessible stall at leasing office, provide maximum 1/2" high transition with 1:2 bevel and add detectable warnings.

For curb ramps near units 105 and 107, 109 and 111, and 133 and 135 and at end of walkway along side of unit 109,  provide maximum 1/2" high transition with 1:2 bevel and reduce excessive slopes to maximum 8.33 %; add accessible parking space at curb ramp at end of parking side breezeways near units 105 and 107.

Provide maximum 1/2" high transition with 1:2 bevel at curb ramps near units 121 and 123 and 133 and 135; add two accessible parking spaces at curb ramp at end of parking side breezeways near units 121 and 123;  add two accessible parking spaces at curb ramp at end of parking side breezeways near units 133 and 135.

As an alternative to noncompliant bridges, create new ANSI compliant accessible routes at courtyard walkway to connect the entrances of all ground floor units to the leasing office and clubhouse entries, to patio side breeze-ways at units 101-104, to breeze-ways at units 105-08, to community garden and play area, to breeze-way at units 125-128, and to breeze-way at units 129-132 (see attached accessible route plan).

At a different location (from the existing rent drop slot), provide an additional rent drop slot within compliant reach range height on an accessible route (current rent drop slot lacks a

minimum 36" wide accessible route and the requisite 30" x 48" clear floor space for a side approach; it also exceeds the 54" maximum height at 60 ½").

At pool gate and at gate to community garden, reduce slopes at maneuvering area to maximum 2 % ; at pool gate, add concrete to create 18" minimum pull side clearance, and relocate trash bin; at gate to community garden ("pea patch") provide minimum 18" pull side maneuvering space by removing gate and adding 36" concrete on one side to eliminate need for additional level maneuvering space.

Provide stable firm minimum 36" wide slip resistant walkway leading to at least one of the planters in the community garden and to bench area in play area.

**LEASING OFFICE/ CLUBHOUSE**

Lower coat hook in fitness area to maximum 48" height or provide additional hook at maximum 48" height.

Raise shelf in fitness area so that it at least 80" inches above the floor or provide cane detectable obstruction underneath; lower coat hooks or add new coat hooks no higher than 54" from the floor.

**APPENDIX A (4)**
**HILBY STATION APARTMENTS**

**APARTMENT INTERIORS**

For all ground floor units in the complex, provide compliant threshold at maximum 3/4" height with 1:2 beveled threshold at entry door and maximum 3/4" height at patio door.  [FHAG Req. 3, 4; ANSI A117.1-1986 § 4.13.8.]

In 1 BR/1BA Apartments (except B-116):

    Increase clear floor space at lavatory in bathroom by installing offset sink with centerline as close as possible to 24" minimum from side wall (but in no case will the centerline be less than 20" from side wall), or provide removable base cabinet, finish flooring and insulate pipes (if defendants choose the offset sink, they will on request provide a removable base cabinet, finish flooring, and insulate pipes if a person with a disability needs a forward approach in order to use the sink).  [FHAG Req. 7, 2].

    Relocate baseboard to bathroom entry hall to provide 30" x 48" clear floor space perpendicular to tub (entry hall will still have 36" wide clearance).

In 2 BR/2BA Apartments (except for A-108):

    Increase clear floor space at lavatory in master and hall bathrooms by installing offset sink with centerline as close as possible to 24" minimum from side wall (but in no case will the centerline be less than 20" from side wall), or provide removable base cabinet, finish flooring and insulate pipes.

    Use offset flange to bring centerline of toilet as close as possible to 18" from the side wall. [FHAG Req. 7.];

In master bedroom walk in closet, install shoe rack or shelf within reach range.

## APPENDIX B

### NOTICE OF RETROFITS TO PUBLIC AND COMMON USE AREAS AT (NAME OF PROPERTY)

(NAME OF THE PROPERTY) is dedicated to the principle of equal housing opportunity.  The federal Fair Housing Act requires that the public and common use areas at complexes such as (NAME OF PROPERTY)  have certain features of physical accessibility for persons with disabilities.

As a result of recent events, inaccessible aspects of the public and common areas of (NAME OF PROPERTY) have been brought to the attention of the developer.  Persons with disabilities are welcomed as residents and guests at (NAME OF THE PROPERTY).  We are sending you this notice to let you know that beginning on _____, 2009, workers will be coming onto the property to begin the process of modifying certain aspects of the public and common use areas.  We expect the process to last approximately _____ weeks.

Generally, the workers will add sidewalks or modify certain existing sidewalks, install curb ramps or modify existing ones, and relocate designated accessible parking spaces.  They will also be adding or making modifications to parking areas, mailboxes, the leasing office and other common use facilities to make them more accessible to persons with disabilities.  We apologize for any inconveniences you may experience as a result of this work, and value you as a resident of (NAME OF PROPERTY).

If you have any questions regarding the work to be done, please contact us at _____.


Management

## APPENDIX C
### NOTICE OF RETROFITS TO GROUND-FLOOR INTERIORS AT
### (NAME OF PROPERTY)

(NAME OF PROPERTY) is dedicated to the principle of equal housing opportunity.  The federal Fair Housing Act requires that ground floor apartments in newer apartment communities have certain features of physical accessibility for persons with disabilities.  Your apartment home has been identified as one that is covered by the Fair Housing Act's accessibility requirements.

Working with the developer of (NAME OF PROPERTY), the United States Department of Justice has identified alleged accessibility barriers in individual ground floor apartments. Persons with disabilities are welcome as residents and guests at (NAME OF PROPERTY).    The developer, therefore, has agreed to modify certain features of your apartment to make it more accessible to persons with disabilities.

The modifications to all ground floor apartment interiors will be completed by (18 MONTHS FROM EFFECTIVE DATE OF THE DECREE).  If you still reside in your apartment when the modifications are scheduled, and if the modifications require your temporary relocation, we will pay reasonable relocation and housing expenses while the modifications are made.  Depending on your particular apartment plan, the modifications to be made may include:

- • Lowering entry or interior door thresholds
- • Widening door openings
- •  Lowering thermostats
- • Providing more clear floor space at kitchen and bathroom fixtures.

You will be notified when the modifications to your unit will be performed.  In the meantime, you may request to have your apartment modified now, again, at no expense to you. If you would like these modifications completed now, please contact us at _____.

In addition, some modifications in unit interiors and in the public and common use areas of the property are available only on request by persons with physical disabilities.  These

- 41 -

modifications are:

- Accessible garage parking (<u>OMIT FROM ROCK CREEK NOTICE</u>)[5]

- Installation of grab bars at toilets and bathtubs

- Removal of bathroom vanity base cabinet to provide a front approach to sink.

To request these modifications, please contact us at _____.

Thank you for your cooperation.  We value you as a resident of (<u>NAME OF PROPERTY</u>).


Management

---

[5]  At the ROCK CREEK APARTMENTS, in lieu of accessible garage parking, upon request of a resident with a disability living in a ground floor apartment unit, one carport shall be restriped to provide an 8 foot space with a 5 foot wide access aisle and a compliant curb ramp connected to an accessible route.  In addition, upon request of a resident with a physical disability living in a ground floor unit at ROCK CREEK, either: 1) a mailbox shall be installed at an accessible location and the owner shall make alternative mail delivery arrangements with the U.S. Postal Service; or 2) a mail slot with a basket shall be installed in the unit entrance door and the owner shall make alternative delivery arrangements with the U.S. Postal Service.

**APPENDIX D**

**NOTICE TO POTENTIAL VICTIMS OF HOUSING DISCRIMINATION**

On_____ 2009, the United States District Court for the Eastern District of Washington entered a Consent Decree resolving a lawsuit brought by the United States Department of Justice against certain builders, developers, architects and engineers alleging that they failed to include certain accessible features for persons with disabilities required by the Fair Housing Act, 42 U.S.C. §3604(f)(3)(C), at (<u>NAME OF PROPERTY</u>).

In that lawsuit, the Department of Justice alleged that (<u>NAME OF PROPERTY</u>) did not comply with the law because:

**(ITEMIZE BY PROPERTY)**

Under this Consent Decree, you may be entitled to receive monetary relief if you or anyone you know:

- **Was discouraged from living at (<u>NAME OF PROPERTY</u>) because of the lack of accessible features;**
- **Has been hurt in any way by the lack of accessible features;**
- **Paid to have your apartment made more accessible to persons with disabilities: or**
- **Was otherwise discriminated against on the basis of disability.**

If you wish to make a claim for discrimination on the basis of disability, or if you have any information about persons who may have such a claim, please contact the **United States Department of Justice** at **_____.**  You may also write:

United States Department of Justice
Civil Rights Division
Housing and Civil Enforcement Section
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

## APPENDIX E

## RELEASE OF ALL CLAIMS

In consideration of and contingent upon the payment of the sum of _____

dollars ($ _____ ), pursuant to the Consent Decree entered in <u>United States</u> v. <u>Lanzce G.</u>

<u>Douglass, *et al.,*</u> United States District Court, Eastern District of Washington, I hereby release

and forever discharge the Defendants named in this action from any and all liability for any

claims, legal or equitable, I may have against them arising out of the issues alleged in this action

as of the date of the entry of that Consent Decree.  I fully acknowledge and agree that this release

of the Defendants shall be binding on my heirs, representatives, executors, successors,

administrators, and assigns.  I hereby acknowledge that I have read and understand this release

and have executed it voluntarily and with full knowledge of its legal consequences.


_____
(Signature)

NAME: _____

ADDRESS: _____

_____

DATE: _____

**APPENDIX F**

**ACKNOWLEDGMENT OF RECEIPT OF CONSENT DECREE**

On _____, I received a copy of and have read the Consent Order entered

by the federal district court in <u>United States of America</u> v. <u>Lanzce G. Douglass, *et al.*</u> , C.A. No.

_____ (E.D. WA).   All of my questions concerning the Consent Decree and the Fair

Housing Act have been answered to my satisfaction.


_____
(Signature)


_____
(Print name)


_____
(Position)


_____
(Date)

1

2

3

## **APPENDIX G**

### **CERTIFICATION OF FAIR HOUSING TRAINING**

4   On _____, I attended training on the federal Fair Housing Act, including

5   its requirements concerning physical accessibility for people with disabilities.  I have had all of

6   my questions concerning the Fair Housing Act answered to my satisfaction.

7

8   _____

9   (Signature)

10   _____

11   (Print name)

12

13   _____

   (Position)

14

15   _____

16   (Date)

17

18

19

20

21

22

23

24

25

26

27

28